IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CSR TECHNOLOGY INC., <br><br> Plaintiff, <br><br> v. <br><br> FREESCALE SEMICONDUCTOR, <br><br> Defendant. | Case No.: C-12-02619 RS (JSC) <br><br> **ORDER GRANTING IN PART AND DENYING PART DEFENDANT'S MOTION TO COMPEL PATENT L.R. 3-1 DISCLOSURES** |

In this patent infringement suit, Defendant Freescale Semiconductor, Inc. ("Defendant") has filed a Motion to Compel Patent Local Rule 3-1 Disclosures ("Motion"), alleging that Plaintiff CSR Technology Inc.'s ("Plaintiff") current disclosures are deficient. (*See* Dkt. No. 40.) After carefully considering the filings in this case, and having the benefit of oral argument on February 7, 2013, the Court GRANTS in part and DENIES in part the Motion.

### BACKGROUND

On May 21, 2012, Plaintiff filed this suit against Defendant claiming direct and indirect infringement of five U.S. patents: Nos. 6,882,827 (the "'827 patent"); 6,933,886 (the "'886 patent); 6,388,590 and 6,388,591 (the "'590/591 patents"); and 6,757,324 (the "'324 patent"). (Dkt. No. 1.)

Based on the parties' stipulation, the Court subsequently dismissed without prejudice Plaintiff's claim concerning the '324 patent. (Dkt. No. 37.) Defendant contends that Plaintiff's infringement contentions ("ICs") for each patent do not comply with Patent Local Rule 3-1.

The '827 patent relates to mechanisms for self-testing a radio transceiver. Typically, transceivers are tested and adjusted (*i.e.*, calibrated) during manufacturing to optimize image rejection (*i.e.*, minimize image response errors). However, such testing adds time and cost to the manufacturing process, and does not address the fact that image rejection performance may change during actual operation of the device, for example as a result of temperature changes. The patent's claimed method for "self-testing" the radio transceiver includes a "switching arrangement" that, when set in a "testing configuration," allows the transmitter's radio frequency ("RF") output to be fed back to the receiver's RF input. The response of the receiver to a known testing signal is used to determine and adjust, or calibrate, the transceiver to maximize image rejection performance.

The '886 patent is directed to a device and method for signal acquisition techniques that enable coherent correlation of received signals. The device and method use data bit information contained within each received signal to calculate the In Phase and Quadrature correlation integrals. The data bit information within the received signal is broken into data blocks and calculations are performed on a block-by-block basis.

The '590 and '591 patents share the same specification and generally relate to interfaces for being able to serially communicate with a device that is compatible with an AT Attachment Packet Interface ("ATAPI"). The ATAPI is a protocol that allows the ATA parallel interface to carry ATAPI packet commands, which extends the types of devices that can use the ATA parallel interconnect cable to transfer data between a storage device and the computer's host controller. The '590 patent is directed to a transmission interface with the storage device that serially transmits data to the storage device. The ATAPI operates on parallel data and the transmission interface has a converter that converts the parallel signals of the ATAPI into serial signals. The '591 patent is directed to a receiver interface with the storage device that serially receives data from the storage device. The ATAPI operates on parallel data and the receiver interface has a converter that converts the serial signals into parallel signals of the ATAPI.

# LEGAL STANDARD

Local Rule 3–1 requires, in pertinent part:

> [A] party claiming patent infringement shall serve on all parties a 'Disclosure of Asserted Claims and Infringement Contentions' . . . [which] shall contain the following information:
>
> (a) Each claim of each patent in suit that is allegedly infringed by each opposing party, including for each claim the applicable statutory subsections of 35 U.S.C. § 271 asserted;
>
> (b) Separately for each asserted claim, each accused apparatus, product, device, process, method, act, or other instrumentality ("Accused Instrumentality") of each opposing party of which the party is aware. This identification shall be as specific as possible. Each product, device, and apparatus shall be identified by name or model number, if known. Each method or process shall be identified by name, if known, or by any product, device, or apparatus which, when used, allegedly results in the practice of the claimed method or process;
>
> (c) A chart identifying specifically where each limitation of each asserted claim is found within each Accused Instrumentality, including for each limitation that such party contends is governed by 35 U.S.C. § 112(6), the identity of the structure(s), act(s), or material(s) in the Accused Instrumentality that performs the claimed function.
>
> (d) For each claim which is alleged to have been indirectly infringed, an identification of any direct infringement and a description of the acts of the alleged indirect infringer that contribute to or are inducing that direct infringement. Insofar as alleged direct infringement is based on joint acts of multiple parties, the role of each such party in the direct infringement must be described.
>
> (e) Whether each limitation of each asserted claim is alleged to be literally present or present under the doctrine of equivalents in the Accused Instrumentality

"The overriding principle of the Patent Local Rules is that they are designed [to] make the parties more efficient, to streamline the litigation process, and to articulate with specificity the claims and theory of a plaintiff's infringement claims." *Bender v. Maxim Integrated Prods., Inc.*, 2010 WL 1135762 *2 (N.D. Cal. Mar. 22, 2010) (alteration in original) (internal citation omitted). Patent L.R. 3-1 is a discovery device that "takes the place of a series of interrogatories that defendants would likely have propounded had the patent local rules not provided for streamlined discovery." *Network Caching Tech., LLC v. Novell, Inc.*, 2002 WL 32126128 *4 (N.D. Cal. Aug. 13, 2002); *see Bender*,

3

2010 WL 1135762 *2.  The rule is also intended to require the party claiming infringement "to crystallize its theories of the case early in the litigation and to adhere to those theories once disclosed."  *Bender v. Advanced Micro Devices, Inc.*, 2010 WL 363341 *1 (N.D. Cal. Feb. 1, 2010).  That party is required to include in its infringement contentions all facts known to it, including those discovered in its pre-filing inquiry.  *See Renesas Tech. Corp. v. Nanya Tech. Corp.*, 2004 WL 2600466 *2 (N.D. Cal. Nov. 10, 2004).

"[A]ll courts agree that the degree of specificity under Local Rule 3–1 must be sufficient to provide reasonable notice to the defendant why the plaintiff believes it has a 'reasonable chance of proving infringement.'"  *Shared Memory Graphics LLC v. Apple, Inc.*, 812 F. Supp. 2d 1022, 1025 (N.D. Cal. 2010) (quoting *View Eng'g, Inc. v. Robotic Vision Sys., Inc.*, 208 F.3d 981, 986 (Fed. Cir. 2000)).  While the patent rules do not "require the disclosure of specific evidence nor do they require a plaintiff to prove its infringement case, . . . a patentee must nevertheless disclose what in each accused instrumentality it contends practices each and every limitation of each asserted claim to the extent appropriate information is reasonably available to it." *DCG Sys. v. Checkpoint Techs., LLC*, 2012 WL 1309161 *2 (N.D. Cal. Apr. 16, 2012); *see also Shared Memory Graphics*, 812 F.Supp.2d at 1025 (stating that patent holder "must map specific elements of Defendants' alleged infringing products onto the Plaintiff's claim construction").

## DISCUSSION

Defendant contends that Plaintiff's ICs for each of the patents are deficient under Rule 3-1(c).  Further, Defendant asserts that Plaintiff's ICs do not adequately disclose its theory of infringement under the doctrine of equivalents as required by Rule 3-1(e).[1]

**A.   The '827 Patent**

The '827 patent claims a particular method for self-testing, or calibration.  The '827 patent method claim at issue, claim 14, discloses

---

[1] Defendant's Motion also challenges Plaintiff's contentions regarding indirect infringement of the '827 and '886 patents, arguing that the ICs fail to satisfy Rule 3-1(d)'s requirement that Plaintiff identify the direct infringement of third parties.  At the hearing, however, Plaintiff represented that Defendant's direct infringement alleged in the claim charts is coextensive with the direct infringement alleged against Defendant's customers.  With this understanding, Defendant does not now seek amendment of the ICs with respect to the indirect infringement contentions.

4

> a switching arrangement having a normal configuration in which the transmitter is coupled to the antenna to apply the second radio frequency signal to the antenna, and a testing configuration in which the transmitter is coupled to the receiver input to apply the second radio frequency signal to the receiver input; the method comprising: [a] setting the switching arrangement to the testing configuration; [b] applying a testing signal to the transmitter input to cause the transmitter to generate a radio signal frequency test signal; and [c] detecting the output signal of the receiver to determine the response of the receiver to the test signal.

(*See* Dkt. No. 41, Ex. 2 at 6:36-62.) Defendant argues that Plaintiff's ICs are insufficient under Rule 3-1(c) because the ICs "point[] to general functionality and improperly assume[] the existence of each claim limitation in Freescale's products." (Dkt. No. 40 at 7.) Further, Defendant contends that Plaintiff "makes the unsupported leap" from the fact that Defendant's products perform calibration to the conclusion that the products perform calibration according to the claimed method. The Court agrees.

Plaintiff asserts that it properly identifies the first step of the method—"setting the switching arrangement to the testing configuration"—because the ICs identify a "number of data paths" "on which signals generated by the transmitter can be applied to the receiver." (Dkt. No. 49 at 7.) While the ICs do indeed make such an identification, the presence of data paths does not by itself explain how the switching arrangement is set to the testing configuration.[2] Nor does Plaintiff's assertion that Defendant's products conduct calibration describe how the first claimed method step is performed. Pointing to a Freescale datasheet that identifies three types of calibration—"IQ auto calibration," "Polar modulation auto calibration," and "Smart AOC Tx power control minimizes factory calibration"—Plaintiff's ICs allege that "[o]n information and belief, one or more of these types of calibrations are implemented by setting the switching arrangement to a testing configuration." (*Id.* at 14-15.) Plaintiff, however, provides no reason to believe that any of the three types of calibration it identifies performs the claimed method steps.[3] As a result, Plaintiff's contentions consist of nothing

---

[2] The data paths identified by Plaintiff are sufficient to satisfy Rule 3-1 with respect to the location of the "switching arrangement" and the "testing configuration." Plaintiff's ICs provide citations to specific pages of a Freescale datasheet and annotated images from that data sheet, which identify the location and make-up of both the "switching arrangement" and the "testing configuration." (*See* Dkt. No. 41, Ex. 3 at 9-12.)

[3] Plaintiff represents that "the '827 patent specification discusses, as an embodiment of the invention, the type of IQ calibration that CSR asserts infringes claim 14." (Dkt. No. 49 at 9 (citing

more than a conclusion based "on information and belief" that since calibration in the Accused Products occurs, it must occur according to the claimed method.  Such contentions do not satisfy Rule 3-1 since they do not "provide reasonable notice to the defendant why the plaintiff believes it has a 'reasonable chance of proving infringement.'"  *Shared Memory Graphics*, 812 F. Supp. 2d at 1025 (granting motion to compel supplemental contentions where, "[r]ather than provide a meaningful description of its theories, [plaintiff's] vague contentions and conclusory statements invited Defendants and the Court merely to *assume* the existence of [asserted limitation]") (emphasis original); *see also Theranos, Inc. v. Fuisz Pharma LLC*, 2012 WL 6000798 *5 (N.D. Cal. Nov. 30, 2012) (finding plaintiff's ICs deficient under Patent L.R. 3-1 where contentions were based "on information and belief").

Plaintiff's ICs concerning the second and third method steps of claim 14 are similarly deficient.  For the second step—"applying a testing signal to the transmitter input to cause the transmitter to generate a radio signal frequency test signal"—Plaintiff's claim chart states that "[t]he Accused Instrumentalities include a processor (see red box in annotated Figure 1 below) that can generate and apply signals to the transmitter input. . . . On information and belief, the processor in the Accused Instrumentalities generate[s] and appl[ies] a test signal to the transmitter input, for example, to perform calibration of the transmitter and/or receiver."  (Dkt. No. 41, Ex. 3 at 16.) Plaintiff's claim that the processor applies a testing signal to the transmitter input to perform calibration according the claimed method is unsupported by anything other than Plaintiff's "information and belief."  As such, Plaintiff's ICs are insufficient under Rule 3-1.

Plaintiff contends that the third step—"detecting the output signal of the receiver to determine the response of the receiver to the test signal"—is performed because "[t]he Accused Instrumentalities include a receiver that generates output signals based upon the signals received by the receiver. . . . On information and belief, the processor in the Accused Instrumentalities determines the response of the receiver to the test signal applied to the receiver input."  (*Id.* at 17-18.)  The support for this contention is lacking.  While Plaintiff's ICs provide an annotated image of

---

'827 patent at 1:16-27; 3:1-5; 4:37-42).)  However, Plaintiff's citations to the patent provide no support for its contention; indeed, those citations do not include even a mention of "IQ calibration."

6

one of Defendant's products, which identifies, among other things, a "receiver output," Plaintiff provides no reason why it believes it has a reasonable chance of proving infringement. The presence of basic transceiver structure and "on information and belief" conclusions do not constitute sufficient "reasonable notice" of Plaintiff's infringement contentions. *See Shared Memory Graphics*, 812 F. Supp. 2d at 1025.

Plaintiff asserts that any deficiency in its ICs is explained by the fact that "the processor generates and receives the relevant signals of method steps [14-b] and [14-c] in software, which is solely within Freescale's control and has not yet been produced by Freescale to CSR." (Dkt. No. 49 at 11.) Plaintiff contends that it is not required to identify "such specific signals in its infringement contentions." (*Id.*) As an initial matter, Plaintiff's ICs do not even mention the processor software that Plaintiff now asserts is crucial in identifying the claim limitations in Defendant's products. In addition, that the processor runs on software is not responsive to Defendant's argument that the ICs fail to provide any reason why Plaintiff believes the Accused Products perform the claimed method.

Finally, although Plaintiff's ICs specifically identify only Defendant's MMM7210 transceiver, Plaintiff argues that it has satisfied Rule 3-1(c) with respect to two separate Accused Products, the MMM6000 and the MMM7010. Plaintiff is incorrect. Rule 3-1(c) requires "[a] chart identifying specifically where each limitation of each asserted claim is found within *each* Accused Instrumentality." (emphasis added). Plaintiff's assertion that it "has identified and charted a specific Freescale product (the MMM7210) and has stated that it is accusing any similarly designed products" is not enough to satisfy Rule 3-1(c)'s explicit requirement that a plaintiff identify the limitations within *each* Accused Instrumentality.

Accordingly, the Court finds that Plaintiff's ICs do not satisfy Rule 3-1(c) in regards to the three claimed method steps in claim 14 of the '827 patent.

**B.    The '886 Patent**

Defendant's challenge of Plaintiff's '886 patent ICs are confined to the same pair of limitations found in each of the independent claims (1, 24, and 25); namely, "obtaining data bit information" and "computing I and Q correlation integrals."

7

1 In regards to one of the Accused Products, the BSC9131 Reference Design Board ("RDB"),[4]
2 Plaintiff's ICs provide that "[t]he Freescale BSC9131 RDB receives Third Generation Partnership
3 Project Long Term Evolution (3GPP LTE) and Wideband Code Division Multiplex (WCDMA)
4 signals via the antennas coupled to the BSC9131 processor at the RF cards (highlighted in red in the
5 BSC9131 RRB+RF block diagram reproduced below" and that "[t]he WCDMA or LTE signals
6 received by the BSC9131 processor are signals that are demodulated by LTE and WCDMA modem
7 software that is part of the VortiQa Layer 1 software sold by Freescale (highlighted in blue in the
8 diagram above) to generate a modulated signal." (Dkt. No. 41, Ex. 5 at 1-3.) In support, the ICs cite
9 to two Freescale documents entitled *QorIQ Qonverge BSC9131 RDB for Femtocell Base Station*
10 *Development* (CSR0020218) and *Next-Generation Wireless Network Bandwidth and Capacity*
11 *Enabled by Heterogeneous and Distributed Networks Paper at VortiQa Layer 1 Software Offering*
12 *and Mapping for BSC913X diagram* (CSR0022208). (*Id.*)

13 Defendant argues that Plaintiff's ICs do not identify how the Accused Products allegedly
14 practice the specific limitation of "obtaining data bit information." Defendant asserts that it is
15 presumptuous for Plaintiff's ICs to claim that because the Accused Products are WCDMA and LTE
16 compliant, the Accused Products infringe the '886 patent. Plaintiff, however, provides a basis for its
17 contention that the WCDMA- and LTE-compliant products meet the limitations in the patent:

> As is well-known, WCDMA uses Universal Mobile Telecommunications System (UMTS) modulation which is then spread using a pseudorandom chip sequence to provide a Direct Sequence Spread Spectrum (DSSS) signal. The UMTS modulation scheme used by WCDMA is Quadrature Phase Shift Keying (QPSK). In a QPSK signal, phase shifts on the I and Q signal represent bits of a symbol. *See Tero Ojanpera and Ramjee Prasad, Eds., WCDMA: Towards IP Mobility and Mobile Internet: Chapter 6 WCDMA (AH Artech House Publishers, 2001)* (CSR0022519 – 54). The BSC9131 RDB in combination with the LTE and WCDMA Modems software that is part of the VortiQa Layer 1 software sold by Freescale (which runs on the BSC9131 processor) obtains data bit information (including sign changes), de-spreads the DSSS QPSK signal, determines the symbols and packets and detects the data. *See Next-Generation Wireless Network Bandwidth and Capacity Enabled by Heterogeneous and Distributed Networks Paper at*

---

[4] Plaintiff's ICs specifically identify the other Accused Products and they provide a separate explanation for each Accused Product. Because Defendant challenges the Accused Products as a whole, the Court's analysis of the ICs related to the BSC9131 RDB includes the other Accused Products as well.

*VortiQa Layer 1 Software Offering and Mapping for BSC913X diagram at pg. 19* (CSR0022208).

(*Id.* at 11-12, 41-42, 63-64.) The LTE and WCDMA Modems software is clearly identified in the diagram referenced above. (*See id.* at 3.) Plaintiff contends that it is this software, which runs on the BSC9131 processor, that provides the structure for "obtaining data bit information." Thus, Plaintiff has identified where this limitation can be found within the Accused Product and has "provide[d] reasonable notice to the defendant why the plaintiff believes it has a 'reasonable chance of proving infringement.'" *Shared Memory Graphics*, 812 F. Supp. 2d at 1025.

Defendant contends, however, that Rule 3-1 requires more. Specifically, Defendant argues that Plaintiff cannot simply state that the limitation resides in software; rather, Plaintiff "must put forward contentions that specifically identify the existence of accused functionality, regardless of whether or not source code eventually may be needed to substantiate and/or disprove alleged infringement." (Dkt. No. 54 at 7.) Defendant's support for its argument is lacking. Without analysis, Defendant cites to *Network Caching Tech. LLC v. Novell Inc.*, 2002 WL 32126128 *5 (N.D. Cal. Aug. 13, 2002) and *NYU v. E. Piphany, Inc.*, 2006 WL 559573 *3 (S.D.N.Y. Mar. 6, 2006). In *Network Caching*, the court held that while reverse engineering was required to meet plaintiff's obligations under Federal Rule of Civil Procedure 11 for non-software limitations, under Rule 3-1(c), the "routines" in the software that carry out the claimed function do not need to be specifically identified because "[t]he only way to pinpoint the specific routine is to analyze the source code, which is solely in the defendants' possession." *Id.* at *6-7. *NYU* concerned a plaintiff's motion to compel production of source code and is thus not helpful in resolving the dispute here.[5]

---

[5] At the hearing, Defendant argued that even if Plaintiff was not required to identify where in the software the limitations are present, Plaintiff must identify the location of the portions of the limitations found in the hardware. Plaintiff contends that it has—those portions are present in the processor on which the software runs. Defendant argues that identifying the processor is not specific enough. The Court disagrees. Plaintiff's ICs allege that the "obtaining data bit information" function is carried out by the software in conjunction with the processor. Defendant provides no reason why such identification does not provide it reasonable notice of Plaintiff's infringement contentions. The Court will not require Plaintiff to parse the limitation and identify which portion of

9

1  Defendant also challenges Plaintiff's citation to a chapter of a textbook on WCDMA
2  technology to support its allegation that WCDMA devices can perform the functions claimed in the
3  '886 patent. Defendant does not contest the substance of the textbook; rather, Defendant asserts that
4  Plaintiff's citation to a 36-page chapter lacks the specificity required by Rule 3-1(c). Plaintiff,
5  however, argues that the entire chapter is relevant as a whole and that the reference provides
6  Defendant notice of Plaintiff's infringement theories. In light of Defendant's failure to articulate
7  why Plaintiff's citation to a 36-page chapter fails to put it on notice as to Plaintiff's infringement
8  contentions, the Court finds that, in combination with citations to other Freescale documents,
9  Plaintiff has provided "reasonable notice" of its infringement theory to Defendant.

10  Regarding the "computing I and Q correlation integrals" limitation, Plaintiff's ICs provide:

> The BSC9131 RDB in combination with the LTE and WCDMA Modems Software (which runs on the BSC9131 processor) correlates the received QPSK signal to despread it. As is well known, this involves computing separate correlation integrals for the I and Q signals between said sampled data and said modulated signals based on said data bit information. *See QorIQ Converge BSC9131 RDB for Femtocell Base Station Development at pg. 2* (CSR0020218) and *Next-Generation Wireless Network Bandwidth and Capacity Enabled by Heterogeneous and Distributed Networks Paper at VortiQa Layer 1 Software Offering and Mapping for BSC913X diagram at pg. 19* (CSR0022208).

18  (Dkt. No. 41, Ex. 5 at 19, 52, 72.) As with the previous limitation, Plaintiff contends that certain of
19  the accused features and functionalities of this limitation reside in software. Defendant does not
20  specifically challenge the ICs' citations in the quoted text above; rather, Defendant simply concludes
21  that "CSR's contentions make no reference to any document that even purports to explain how the
22  use of WCDMA or LTE signals or the QPSK demodulation scheme would, as CSR contends,
23  require functionality for . . . 'computing I and Q correlation integrals,' as required by the asserted
24  claims." (Dkt. No. 40 at 11.) Plaintiff, however, *does* reference documents in support of its
25  contention and Defendant does not explain why those references are insufficient. To the extent

---

28  the function is performed by the hardware, and where it is located, and which portion of the function is performed by the software.

10

Defendant disagrees with the conclusions Plaintiff draws from those documents, that issue is directed towards the merits of the litigation, not to Rule 3-1.

Because Plaintiff's ICs identify the limitations of the '886 patent as residing in specific software—which is exclusively in Defendant's possession—the Court finds that Plaintiff's ICs are sufficient for purposes of Rule 3-1(c). Defendant's Motion is accordingly denied with respect to the '886 patent.

**C.     The '590 and '591 Patents**

Defendant argues that the ICs are deficient because they do not adequately allege the existence of several limitations, including "ATAPI transmission circuit," "ATAPI receiver circuit," "packetizing circuit," and "depacketizing circuit." Defendant contends that Plaintiff's ICs are merely based on the allegation that the Accused Products contain a serial ATA ("SATA") interface that is compliant with the ATAPI standard. That is, because the Accused Products include a SATA interface compliant with the ATAPI standard, the Accused Products also include the limitations listed above. Defendant asserts that "[t]his is both untrue and unsupported by CSR's infringement contentions." (Dkt. No. 54 at 8.)

Rule 3-1(c) requires that a plaintiff provide "[a] chart identifying specifically *where* each limitation of each asserted claim is found within each Accused Instrumentality." (emphasis added). Although Plaintiff asserts that its ICs identify where each limitation is found, its ICs simply claim that the presence of the limitations are required without specifically identifying where the limitations can be found in the Accused Products. This is not sufficient under Rule 3-1. Plaintiff's Opposition to the Motion confirms this deficiency. Plaintiff states that "the Infringement Contentions show that the SATA interface found in the accused products use ATAPI commands, which requires the use of ATAPI circuits, including the transmission of ATAPI commands. As such, the Infringement Contentions adequately disclose *the presence* of the claimed ATAPI transmission circuit." (Dkt. No. 49 at 19-20 (emphasis added); *see also id.* at 20-21 (providing nearly identical reasoning for the "ATAPI receiver circuit," "packetizing circuit," and "depacketizing circuit" limitations).) Contending that the limitation must exist somewhere in the Accused Product is not the same as specifically identifying where each limitation is found within the Accused Product. *See Bender v.*

*Maxim Integrated Prods., Inc.*, 2010 WL 1135762 *3 (N.D. Cal. Mar. 22, 2010) (finding plaintiff's ICs deficient under Rule 3-1 where plaintiff claimed that the limitation's presence was required but did not disclose its location; noting that "[w]hile plaintiff's statements may not be untrue, they are based on assumptions").

Although Plaintiff may have good reason to conclude that the limitations of the '590 and '591 patents are present in the Accused Products, that determination is not enough. Indeed, at the hearing Plaintiff asserted that a "deserializer" and a "serializer" located on one of the diagrams in the ICs adequately disclose the "depacketizing circuit" and the "packetizing circuit," respectively. Plaintiff's ICs, however, do not currently reflect this theory, as required by Rule 3-1(c). Because Plaintiff has failed to specifically identify in the ICs where the limitations can be found within the Accused Products with respect to the '590 and '591 patents, Defendant's Motion is granted.

**D.      Doctrine of Equivalents**

Defendant argues that Plaintiff's ICs fail to comply with Patent L.R. 3–1(e), which requires Plaintiff to state "[w]hether each limitation of each asserted claim is alleged to be literally present or present under the doctrine of equivalents in the Accused Instrumentality." "[J]udges of this court have rejected plaintiffs' attempts to assert claims under the doctrine of equivalents with blanket statements." *OptimumPath, LLC v. Belkin Intern., Inc.*, 2011 WL 1399257 *8 (N.D. Cal. Apr. 12, 2011); *see also Creagri, Inc.*, 2012 WL 5389775 *6 ("Creagri cannot merely add boilerplate language asserting that the doctrine of equivalents has been met as an alternative theory. It must specify in what way Pinnaclife's products infringe under the doctrine of equivalents, or drop the contention altogether . . . ."). Although Plaintiff cites to a case from this District that suggests a barebones recitation of a doctrine of equivalents allegation is sufficient under the Local Rules, later cases reject such a holding. *Compare Keithley v. Homestore.com, Inc.*, 553 F. Supp. 2d 1148, 1151 (N.D. Cal. 2008) (Illston, J.) (finding boilerplate language sufficient under Rule 3-1(e)), *with Implicit Networks Inc. v. Hewlett-Packard Co.*, 2011 WL 3954809 *3 (N.D. Cal. Sept. 7, 2011) (Illston, J.) ("The Court agrees that Implicit cannot simply recite the doctrine of equivalents in its cover pleading to its claim charts without providing specific analysis, on an element-by-element basis, as to its theory of why there is infringement under the doctrine of equivalents.").

1 Here, Plaintiff acknowledges that for most of the asserted claims, it provides only a bare
2 recitation of the doctrine of equivalents. (*See* Dkt. No. 49 at 24 (citing to instances in the claim chart
3 where Plaintiff claims that "[i]n addition to literally infringing this claim limitation, the Accused
4 Instrumentalities also infringe under the doctrine of equivalents. The above-described functionality
5 is at most insubstantially different from the claimed functionality and performs the same function in
6 the same way to achieve the same result").) As Plaintiff concedes, this boilerplate recitation is
7 insufficient under Rule 3-1(e).

8 Plaintiff provides slightly more than boilerplate language with respect to two limitations in
9 the '827 patent's preamble and six limitations in the '886 patent. (*See* Dkt. No. 41, Ex. 3 at 9, 14; *id.*
10 at Ex. 5 at 13, 20 46, 53, 65, 74.) These contentions, however, also do not comply with Rule 3-1(e).
11 For example, with respect to the '886 patent Plaintiff alleges:

> In addition to literally infringing this claim limitation, each of the Accused
> Instrumentalities also infringe under the doctrine of equivalents. The above described
> functionality is at most insubstantially different from the claimed functionality and
> performs the same function in the same way to achieve the same result. In particular,
> each of the Accused Instrumentalities obtains data bit information from the received
> signals in order to perform the same function of getting data bits in the same way of
> extracting the data bits from the received signal for the same purpose of obtaining the
> data bits.

18 (*Id.* at Ex. 5 at 13, 46, 65.) As Defendant asserts, this language merely references the entire Accused
19 Product, rather than discrete components, as the equivalent structure that accomplishes the claimed
20 function of obtaining data bit information. Although more words are added to the boilerplate, the
21 difference is superficial. Plaintiff must specify in what way Defendant's products infringe under the
22 doctrine of equivalents, "or drop the contention altogether." *See Creagri, Inc.*, 2012 WL 5389775
23 *6.

24 Further, even with the single contention that includes language that appears to meet Rule 3-
25 1(e)'s standard, Plaintiff includes only a sampling of its doctrine of equivalents theory. With respect
26 to the '827 patent's requirement for, among other things, a transmitter capable of receiving an input
27 signal, and a second mixer for mixing signals and a generating a second radio frequency signal,
28 Plaintiff alleges:

13

> In addition to literally infringing this claim limitation, the Accused Instrumentalities also infringe under the doctrine of equivalents. The above described functionality is at most insubstantially different from the claimed functionality and performs the same function in the same way to achieve the same result. *For instance*, to the extent Freescale contends that the identified modulator components are not mixers, these components are insubstantially different from the claimed mixers. The modulator components perform the same function (i.e. generating a second radio frequency signal for transmission) in substantially the same way (i.e. by combining the transmitter input signal with a local oscillator signal) to achieve the same result (i.e. a radio frequency signal for transmission is generated).

(Dkt. No. 41, Ex. 3 at 9 (emphasis added).) Plaintiff provides no authority for the proposition that it need only provide a sampling of its equivalency theory. Rule 3-1(e) requires that Plaintiff disclose its entire theory at this stage in the case.

## CONCLUSION

For the reasons stated, the Court GRANTS in part and DENIES in part the Motion. With the exception of Plaintiff's direct infringement contentions of the '886 patent, and its indirect infringement contentions of the '827 and '886 patents, Plaintiff's ICs must be amended to comply with Patent Local Rule 3-1. Plaintiff shall have 30 days from the date of this Order to so amend.

IT IS SO ORDERED.

Dated: February 8, 2013

JACQUELINE SCOTT CORLEY
UNITED STATES MAGISTRATE JUDGE